UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    :
SECURITIES AND EXCHANGE COMMISSION,                 :
                                                    :
                         Plaintiff,                 :
                                                    :
              v.                                    :   Civil Action No.
                                                    :
RICHARD WEED,                                       :   **JURY TRIAL DEMANDED**
THOMAS BRAZIL and                                   :
COLEMAN FLAHERTY III,                               :
                                                    :
                         Defendants.                :
_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against defendants Richard Weed ("Weed"), Thomas Brazil ("Brazil") and Coleman Flaherty III ("Flaherty"):

## SUMMARY

1.     Starting as early as 2006, and focused mainly during the period from the fall of 2008 through the summer of 2010, the defendants engaged in a so-called pump and dump scheme 1) to manipulate, and thereby artificially increase, the stock price and trading volume of CitySide Tickets, Inc. ("CitySide") stock, or securities, through a fraudulent promotional campaign – the pump -  and to then sell millions of unrestricted shares (which are generally shares of stock that are freely tradeable) of the publicly traded stock of CitySide – the dump ("the CitySide pump and dump scheme" or "the pump and dump scheme"), and 2) to deceive CitySide's transfer agent, the financial institution that issued the company's stock certificates, and thereby cause the issuance of millions of shares of unrestricted stock which could be, and

were, sold to unsuspecting investors in the market.  Brazil and Flaherty garnered approximately

three million dollars of illegal proceeds from the CitySide pump and dump scheme.  Weed, a

licensed attorney, profited from his role in the scheme in several ways, including a $5000 per

month payment as the purported outside counsel for CitySide and a predecessor entity, and by

receiving more than $100,000 spread over multiple payments relating to the pump and dump

scheme.

2.      The groundwork for the scheme began as early as February, 2006, when Weed

became the beneficial owner of approximately 45% of the issued and outstanding unrestricted

stock, or securities, of GFY Foods, Inc. ("GFY Foods"), a corporate entity whose stock traded

publicly through the Over-the-Counter (OTC) securities markets ("the OTC markets"). Through

a series of business and financial transactions over the next several years the structure and nature

of GFY Foods changed and it was transformed into CitySide, a Massachusetts-based company

that purported to be in the business of brokering tickets, that is, buying and reselling primarily

sporting event tickets.  CitySide also was a publicly traded company whose stock traded in the

OTC markets.

3.      The OTC securities markets are decentralized markets that do not have actual

physical locations where stocks can be bought and sold.  Instead, buyers and sellers in the OTC

markets trade with one another through various communication modes such as the telephone,

email and proprietary electronic trading systems. The OTC markets are less transparent than, for

instance, stock exchanges and also are subject to fewer regulations.  Between 2008 and 2010 the

defendants used GFY Foods and its successor entities, including CitySide, as a vehicle for

shaping and carrying out their pump and dump scheme through the OTC markets.

4.     Once the defendants had formed CitySide they began implementing their scheme to defraud by causing the dissemination of materials and information to the public, including potential investors, containing false, exaggerated and/or misleading information through, among other things, a) press and news releases and/or promotional materials, b) a massive email touting campaign, and c) internet promotion and coverage, all designed to generate the appearance of interest in and demand for the stock and to increase the price of the stock ("the pump").

5.     The scheme also involved Brazil and Flaherty obtaining additional unrestricted shares of CitySide stock, for sale to the investing public, through "debt conversion" transactions and by selling shares of CitySide stock while falsely promoting CitySide as a legitimate and growing company, which they knew not to be true.  Unrestricted shares of stock are securities that are fully vested and that can be transferred without restriction or without conditions being met.  A debt conversion transaction involves a lender, here one or more of the defendants and/or entities controlled by one or more of the defendants, converting purported loans made to CitySide or a predecessor entity into equity shares of stock in CitySide.

6.     Weed, a licensed attorney, assisted with a critical aspect of the scheme by knowingly creating backdated and forged convertible promissory notes.  The convertible promissory notes were financial instruments that purportedly reflected agreements by CitySide or a predecessor entity to issue a specified volume of stock in return for loans it received.   Weed knowingly drafted and sent fraudulent legal opinion letters to CitySide's transfer agent which stated that the promissory notes could be converted into millions of purportedly unrestricted shares of CitySide common stock.  Acting upon the clearance given in Weed's fraudulent legal opinion letters, CitySide's transfer agent issued millions of unrestricted shares of stock to Brazil

and Flaherty, and to individuals and entities controlled by them, and the shares were then sold at artificially inflated prices as part of the pump and dump scheme.

7.      Weed also assisted in the scheme by helping to implement a reverse stock split and thereby reduce the number of shares in the hands of public investors and outside of Brazil's and Flaherty's control.  Weed also assisted in the scheme by using his position as an officer and director of CitySide to cause the company's issuance of a board resolution requiring CitySide's Chief Executive Officer (CEO) to refer to Weed all calls and inquiries from investors, current and former shareholders and others.

8.      By late December 2009, Brazil and Flaherty controlled at least 5,000,000 of the 5,263,369 purportedly unrestricted shares of CitySide stock and owned promissory notes purportedly giving them the right to obtain approximately 46 million additional shares.  Brazil and Flaherty also had the ability to control an additional approximately 50 million restricted shares (generally shares of stock that are restricted from being freely tradeable) of CitySide stock held by CitySide's CEO because they were providing the CEO with financing necessary to keep the business afloat.

9.      Beginning in approximately February 2010, Brazil and Flaherty funded a fraudulent promotional campaign with the aim of artificially increasing CitySide's stock price. Once the stock price sufficiently increased, Brazil and Flaherty caused millions of shares of CitySide stock to be sold, for which they received proceeds of approximately three million dollars.  After Brazil and Flaherty had dumped these millions of shares of CitySide stock into the OTC market, where they were purchased by unsuspecting investors, Brazil and Flaherty stopped providing financing to CitySide.  The market for stock in the company collapsed shortly thereafter.

10.     By knowingly and recklessly engaging in the fraudulent conduct described herein, Defendants Weed, Brazil and Flaherty violated the antifraud provisions of the federal securities laws, specifically, Sections 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.     By engaging in the conduct described herein, Defendants Weed, Brazil and Flaherty violated the registration provisions of the federal securities laws, specifically, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

12.     Based on this conduct, the Commission seeks the following relief against the Defendants:  (i) entry of permanent injunctions prohibiting all Defendants from engaging in future violations of Section 10(b) of the Exchange Act, and Rule 10b-5, thereunder; Section 17(a) of the Securities Act of 1933; and Sections 5(a) and 5(c) of the Securities Act; (ii) an order requiring all Defendants to disgorge their ill-gotten gains and pay pre-judgment interest; (iii) an order requiring all Defendants to pay appropriate civil monetary penalties; (iv) an order barring all defendants from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); and (v) an order barring Weed from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## **AUTHORITY AND JURISDICTION**

13.     The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section

22(a) of the Securities Act [15 U.S.C. §77v(a)], and Sections 21 and 27 of the Exchange Act [15

U.S.C. §§78u(e) and 78aa].  The District of Massachusetts is a proper venue for this action under

28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of

the Exchange Act [15 U.S.C. § 78aa] because many of the Defendants' acts and transactions

constituting violations of the Exchange Act and the Securities Act took place in the District of

Massachusetts.  Also, defendants Brazil and Flaherty reside within the District of Massachusetts.

15.     The Defendants, directly or indirectly, made use of the means and

instrumentalities of interstate commerce, or of the mail, in connection with the acts, practices,

and courses of business alleged herein.

## DEFENDANTS

16.     Richard Weed, age 52, resides in Newport Beach, California.  Weed is an attorney

licensed to practice in California and Texas and is the managing partner of Weed & Co., LLC, a

law firm based in Newport Beach.  During the CitySide pump and dump scheme Weed served as

a Director and Secretary of CitySide.

17.     Thomas Brazil, age 52, resides in Topsfield, Massachusetts.

18.     Coleman Flaherty, age 47, resides in Hingham, Massachusetts.

### THE SCHEME TO MANIPULATE THE PRICE AND TRADING VOLUME OF AND TO PUMP AND DUMP CITYSIDE STOCK

### A.  The Defendants Use Reverse Mergers To Structure CitySide as a Publicly Traded Company To Be Used in Their Pump and Dump Scheme

19.     In approximately February 2006, Weed became the beneficial owner of 45% of

the unrestricted stock of GFY Foods, then a publicly traded company, and in April 2006 Weed

became the President, Secretary, Treasurer, and Director of GFY Foods.  GFY Foods had no

operations from approximately February 2006 through mid-December 2008.

20.     Between November 2008 and January 2009, Brazil and Flaherty purchased a

controlling interest in GFY Foods from Weed for approximately $115,000.  As part of the

transaction, GFY Foods merged with The UpTurn, Inc. as part of a reverse merger transaction in

which The UpTurn, Inc., a private company, became a publicly traded company without

resorting to an initial public offering of stock.  The reverse merger between The UpTurn, Inc.

and GFY Foods was completed in or about March 2009 when GFY Foods changed its name to

The UpTurn, Inc. ("UpTurn").   Also as part of the transaction, Brazil and Flaherty – or entities

under their control – received approximately 250,000 shares of GFY stock from Weed.  In

addition, the CEO of UpTurn received approximately 14,750,000 restricted shares of stock in the

new company after the merger was completed.  The defendants structured the transaction, and

created the new publicly traded company, UpTurn, for the purpose of manipulating the trading

volume and share price of Upturn stock in order to generate illegal profits.

21.     As part of the reverse merger the defendants arranged for UpTurn to agree to

honor approximately $170,000 of Convertible Notes purportedly held by Flaherty.  The notes

supposedly could be converted into 50,000,000 shares of unrestricted UpTurn stock.  No such

notes existed, however.  In June 2009 Weed proposed that backdated promissory notes ("the

UpTurn notes") be created to reflect the purported transaction.  Weed drafted ten UpTurn notes

which, by their terms, could be converted into 50,000,000 shares of UpTurn stock.  Weed e-

mailed the notes to Flaherty, who then provided them to UpTurn's CEO for his signature.  The

ten UpTurn notes prepared by Weed were backdated to April 4, 2009.  The UpTurn CEO would

not agree to sign the backdated notes and responded via e-mail to Weed telling him to change the

date of the notes to the present date and to sign the notes himself, as by that time Weed was the sole officer and director of UpTurn.  Weed replied via e-mail that he would handle the UpTurn notes.

22.     The UpTurn CEO never signed the notes drafted by Weed, nor did the CEO authorize Weed to sign any such notes on his behalf.    Weed, however, took the unsigned UpTurn notes and ultimately produced at least three of the notes with the CEO's signature on them, backdated to April 4, 2009.  The signatures and signature blocks on those three UpTurn notes indicate that the documents were tampered with.  The UpTurn CEO has reviewed one of the notes and confirmed that he never signed it and that the signature purporting to be his is a forgery.   Weed, however, handled and used the UpTurn notes as though they were legitimate. In 2009 and 2010 Weed wrote legal opinion letters in which he cited the notes, purportedly signed by the UpTurn CEO, as a basis for supporting Flaherty's rights to stock in UpTurn's successor entity, CitySide.  Weed sent the legal opinion letters to CitySide's transfer agent to effectuate the delivery of stock to Flaherty.

23.     By early July 2009, the relationship between UpTurn's CEO and Flaherty had soured and the defendants' planned manipulation of UpTurn's stock seemed at an end.  As a result, the defendants sought a different public company, and stock with a different name and ticker symbol, to be used as the vehicle for the pump and dump scheme.  In early July, Flaherty e-mailed Weed about taking back "the shell," which referred to UpTurn and its intended use in a market manipulation.  Flaherty and Weed moved quickly, and on July 6, 2009, UpTurn's CEO resigned and Weed replaced him as President and Treasurer of UpTurn.  Related to these changes, on July 30, 2009, Flaherty wired $50,000 to UpTurn.  Weed (who controlled UpTurn's bank account) then wired the money to UpTurn's CEO in exchange for, among other things, all

8

of the CEO's UpTurn stock (approximately 14,750,000 restricted shares).  After the transaction was completed, Weed had become UpTurn's sole officer and sole director.  Brazil and Flaherty did not have formal roles with UpTurn, but exercised financial and decision-making control over the company.

24.     The defendants acted to create a new company out of the old shell, UpTurn.  The defendants structured a merger deal involving UpTurn and Higs CitySide Tickets, Inc., a private company located in Boston, Massachusetts ("CitySide  MA"), that was experiencing financial difficulties.  CitySide MA's owner approached Flaherty to provide financing for the company.  In response, Flaherty and Brazil represented to the owner that they could turn CitySide MA into a publicly traded company (through a reverse merger) and thereby provide the company with $250,000 in financing.  On or about September 2, 2009, CitySide MA finalized a reverse merger with UpTurn.  In November 2009, UpTurn changed its name to CitySide Tickets, Inc. ("CitySide"), and in December 2009 CitySide stock began trading in the OTC markets under the ticker symbol CIST.

25.     The defendants had successfully used this reverse merger to create a new company, with a new name and a new ticker symbol for the buying and selling of its stock.  The former owner of CitySide MA became the new CitySide's President and Treasurer, while Weed served as the company's Secretary and as one of its two directors.  Brazil and Flaherty did not have formal roles with CitySide, but exercised financial and decision-making control over the company.   In addition, Flaherty was an affiliate of CitySide by virtue of his beneficial ownership of the company's stock.  Flaherty also was a *de facto* officer of CitySide by virtue of his secret control over the company.

9

**B.   The Defendants Pump and Dump CitySide's Stock**

   **1.   Obtaining and Distributing Shares of CitySide's Stock**

26.    As of December 2009, Brazil and Flaherty began obtaining additional unrestricted

shares of CitySide through debt conversion transactions.  The debt conversions consisted of

Brazil and Flaherty converting notes reflecting earlier loans to one of CitySide's predecessor

entities into shares of CitySide stock.

27.     Between December 2009 and at least April 2010, Flaherty converted a series of

promissory notes into millions of purportedly unrestricted shares of CitySide stock.  Flaherty

then distributed those shares for trading to individuals and entities under his and Brazil's control.

On or about December 21, 2009, Flaherty converted $15,000 of a $20,000 note held by Trinity

Alliance Ltd. ("Trinity Alliance"), an entity he controlled, into 5,000,000 shares of CitySide

stock.  Flaherty then distributed the shares in four equal blocks of 1,250,000 shares to entities

and individuals he controlled.

28.    On or about January 4, 2010, Flaherty converted $18,656.85 of a $20,000.00 note

held by Trinity International LLC ("Trinity International"), an entity he controlled, into

6,218,950 shares of CitySide stock.  Flaherty then distributed most of the shares in blocks of

varying sizes to entities and individuals he and/or Brazil controlled.

29.    On or about March 16, 2010, Flaherty converted $20,000.00 of a note held by 24-

7 Media Ltd. ("24-7 Media"), an entity he controlled, into 6,666,667 shares of CitySide stock.

Flaherty then distributed a block of 3,133,334 shares to Boston Financial Partners, an entity

controlled by Brazil, and a block of 3,333,333 shares to himself.

30.    Weed assisted Flaherty in obtaining these purportedly unrestricted shares, which

were specifically targeted for use in the CitySide pump and dump scheme, by assisting with the

conversion of the promissory notes into purportedly unrestricted shares and with the distribution

of those shares to entities that Flaherty and Brazil controlled.  Weed ultimately issued a number

of legal opinion letters that cleared CitySide's transfer agent to issue unrestricted shares to

entities that Weed knew were controlled by Flaherty and Brazil.

### 2.  Weed Issues Fraudulent Opinion Letters

31.     After CitySide MA merged into UpTurn to create the new publicly traded

company, CitySide, Flaherty regularly contacted Weed to request the issuance of shares of

CitySide stock to himself, Brazil, and entities or individuals under one or both of their control.

Weed knew, or was reckless in not knowing, that issuance of the shares was being sought so that

they could be used in the CitySide pump and dump scheme.  At the time, Weed was the

Secretary and one of two directors of CitySide.  Weed then drafted, signed, and sent legal

opinion letters ("the fraudulent opinion letters") to CitySide's transfer agent.  The transfer agent,

a financial institution, was assigned by CitySide to maintain records of investors and account

balances and transactions and to cancel and issue stock certificates.  Weed's letters gave

clearance to the transfer agent to issue unrestricted shares of CitySide common stock to Flaherty,

Brazil, and entities under their control.  Weed's legal opinion letters were fraudulent as the

letters relied upon the backdated and forged convertible UpTurn notes as the basis for the

issuance of the stock.  The letters also were fraudulent because in them Weed stated that the note

holders were not affiliated with the issuer.  In fact, Weed knew, or was reckless in not knowing,

that the note holders all were Flaherty-controlled entities, and Weed knew that Flaherty

controlled CitySide.

32.     On or about December 22, 2009 Weed sent a letter to CitySide's transfer agent

stating that Trinity Alliance had elected to convert a $20,000 face amount Convertible Note into

5,000,000 shares of common stock.  Weed stated that the Convertible Note was originally issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons who have elected to convert Convertible Notes into common stock were affiliates of the Issuer and that none of these persons had been affiliates during the preceding three months.  Weed knew that the replacement Convertible Note referenced in his December 22, 2009 letter was fraudulent, having been backdated and forged, if it existed at all.  Weed also knew that Trinity Alliance was affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity Alliance.

33.     On or about January 4, 2010, Weed sent a letter to CitySide's transfer agent stating that Trinity International had elected to convert a $20,000 face amount Convertible Note into 6,218,950 shares of common stock.  Weed stated that the Convertible Note was originally issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons who have elected to convert Convertible Notes into common stock are affiliates of the Issuer and none of these persons have been affiliates during the preceding three months.  Weed knew that the replacement Convertible Note referenced in his January 4, 2010 letter was fraudulent, having been backdated and forged, if it existed at all.  Weed also knew that Trinity International was affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity International.

34.     On or about March 15, 2010, Weed sent a letter to CitySide's transfer agent stating that 24-7 Media had elected to convert a $20,000 face amount Convertible Note into 6,666,667 shares of common stock.  Weed stated that the Convertible Note was originally issued

on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note

Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons

who have elected to convert Convertible Notes into common stock are affiliates of the Issuer and

none of these persons have been affiliates during the preceding three months.  Weed knew that

the replacement Convertible Note referenced in his March 15, 2010 letter was fraudulent, having

been backdated and forged, if it existed at all.  Weed also knew that 24-7 Media was affiliated

with Flaherty.  In fact, Weed knew that Flaherty controlled 24-7 Media.

35.      As a direct result of each of these opinion letters, CitySide's transfer agent issued

stock certificates representing millions of purportedly unrestricted shares of CitySide stock to

Flaherty, Brazil, and/or individuals or entities under their control.  These shares were then sold

by Flaherty, Brazil, and/or entities under their control as part of the CitySide pump and dump

scheme.

36.      The sales of CitySide stock into the public markets that were made possible by

Weed's fraudulent opinion letters did not comply with the one-year holding period required by

Securities Act Rule 144 ("Rule 144").  In addition, even if Rule 144's one-year holding period

had been met, Flaherty and Brazil were affiliates of the issuer, CitySide, and failed to comply

with Rule 144's volume limits.  For instance, the number of shares that Flaherty sold through

accounts in his own name (approximately 6,050,000 shares) and the number of shares that Brazil

sold through accounts in the name entities he controlled (approximately 8,671,784 shares)

greatly exceeded the restrictions mandated by Rule 144.  Weed knew, or was reckless in not

knowing, that the fraudulent opinion letters he authored and sent to CitySide's transfer agent

would enable shares of CitySide stock to be sold into the public markets in violation of Rule

144's proscriptions.

37.     During the period Weed served as CitySide's Secretary and one of its two directors, and when he sent the fraudulent opinion letters to CitySide's transfer agent, Weed knew that CitySide was being promoted by a company ("the Group") that Flaherty and Brazil had engaged to conduct a promotional campaign for CitySide as part of the pump and dump scheme.  In fact, Brazil e-mailed Weed a "reminder" to pay the Group for the creation of four commercials promoting the company, and Weed responded by sending Flaherty and Brazil the contract that he had signed on behalf of the Group as well as proof that a $15,000 wire had been sent to the company.  The commercials produced by the Group began airing on or about February 19, 2010, which is approximately when the fraudulent promotion of CitySide's stock began.  Weed also knew, or was reckless in not knowing, that Flaherty and Brazil were selling CitySide's stock during or following the promotion as Flaherty contacted Weed in March and April 2010 requesting that additional notes be converted and more free-trading shares be issued to himself and Brazil.

38.     During the period Weed served as CitySide's Secretary and one of its two directors, and when he sent the fraudulent opinion letters to CitySide's transfer agent, Weed knew, or was reckless in not knowing, that Flaherty controlled Trinity International, Trinity Alliance, and 24-7 Media.  In addition to being told by Flaherty that Flaherty himself controlled the three entities, Weed participated in and/or had knowledge of transactions involving Flaherty and the three entities that indicated Flaherty's control over them.  Weed also knew that Brazil controlled Boston Financial Partners, an entity through which Brazil sold millions of shares of CitySide stock.

39.     During the period Weed served as CitySide's Secretary and one of its two directors, and when he sent the fraudulent opinion letters to CitySide's transfer agent, Weed

knew, or was reckless in not knowing, that Brazil and Flaherty controlled CitySide and therefore

qualified as "affiliates" of CitySide under Rule 144.  Weed participated in and/or had knowledge

of transactions involving Flaherty and Brazil that evidenced their control over the company.

### 3. Weed Conceals Flaherty's and Brazil's Control of, and Interest in, CitySide

40.     Weed served as an officer and director of CitySide so that Brazil and Flaherty

could control the company without being formally identified as officers and directors

themselves.  In doing so, Weed concealed their control of the company by allowing Brazil and

Flaherty to act through him.  For instance, to allay any concern that CitySide's CEO might

inadvertently undermine the pump and dump scheme or identify Flaherty or Brazil if he was

contacted by investors or regulators, Weed implemented a board resolution requiring the CEO to

direct all requests for information about CitySide to Weed, including all "calls and requests for

information from investors, current and former stockholders, securities regulators, trading

venues, investor relations firms, the press, and any person who does not have a written

agreement in place with the Company."  In fact, Weed went as far as to draft a script for the CEO

to use in the event that he was contacted.  If contacted by phone, Weed suggested that the CEO

respond as follows:

> "Thank you for your call.  As President of a public company, I have many
> responsibilities.  Please direct you[r] inquiry to our corporate secretary, Rick Weed.  His
> email address is rick@weedco.com.  His telephone number is (949) 475-9086, ext. 22."

If the CEO received an email, Weed suggested he respond as follows: "Thank you for your

inquiry.  It has been forwarded to our corporate secretary for the appropriate response."

41.     Weed also concealed Flaherty's and Brazil's interests in CitySide by spreading

out shares to be distributed to them among various entities and individuals in order to create the

appearance that Flaherty and Brazil were not affiliates of the company.  When Weed issued the

fraudulent opinion letters he performed calculations to ensure that all domestic entities/individuals who received stock from the conversions would appear to hold less than 5% of the company's stock, while all foreign entities/individuals who received stock from the conversions would appear to hold less than 10% of the company's stock after the new shares were issued.

### 4. The Pump

42.     With millions of purportedly unrestricted shares available to sell, Brazil and Flaherty paid for fraudulent promotions concerning CitySide in order to artificially increase CitySide's stock price and trading volume.  Brazil and Flaherty used the promotions to drive up the price of CitySide stock so that they could sell the millions of shares they held at artificially high prices.

43.     On or about February 22, 2010, a company Brazil controlled, Boston Financial Partners, wired $112,000 to Flaherty's company, Trinity International, to help pay for the promotional campaign.  Between approximately February 16, 2010 and February 26, 2010, Trinity International wired approximately $223,360 to two entities that run e-mail promotional campaigns for publicly traded companies.  At a meeting on February 26, 2010, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, Brazil described his and Flaherty's investment in the fraudulent promotional campaign, and their intention to abandon CitySide once the pump and dump scheme ran its course.

44.     On or about February 22, 2010, as part of the fraudulent promotional campaign, a mass e-mail alert was released stating that CitySide was "poised to become a national leader in the market through its upcoming acquisition of smaller ticket firms across the country . . ."  The promotional alert was funded by Flaherty through one of the entities he controlled and

distributed to prospective investors in Massachusetts and elsewhere through wire communications in interstate commerce. The alert was false and misleading as CitySide lacked the means for such acquisition and the defendants, who controlled CitySide's finances, lacked interest in actually growing the business.

45. On multiple dates in March 2010, promotional alerts funded by Flaherty and Brazil were released describing CitySide as "The Hottest Ticket I've Ever Seen," and stating:

> "CitySide Tickets Inc. [is] actually in the process now of swallowing up 5 smaller ticket resellers that could send next year's profits through the roof. And, as a significantly juicer fish, CitySide Tickets Inc. …will suddenly represent an irresistible takeover target for Ticketmaster, the biggest fish of all. Ticketmaster will be happy to pay dearly for its meal, because it needs CitySide Tickets' business to satisfy its insatiable appetite. . . CitySide Tickets Inc. … is already looking like Ticketmaster's next acquisition, an event that could easily jump this under-50-cent stock to $2.50 - $3.50 overnight.

Virtually none of these representations were true.

46. On or about March 8, 2010, a promotional alert funded by Flaherty through an entity he controlled was released stating that CitySide was "poised to become a national leader in the market through its upcoming acquisition of smaller ticket firms across the country . . ." The statement was false and misleading in that CitySide did not have upcoming acquisitions of smaller ticket firms across the country planned. The statement also was false and misleading because CitySide was not poised to become a national leader in the market.

47. On or about March 16, 2010, an entity affiliated with the Group released an internet posting stating that CitySide's goal was "to become an active competitor to ticket giant, StubHub." Brazil and Flaherty, who paid the Group to promote CitySide, knew the statement in the internet posting was false.

48. On or about March 23, 2010, a stock promoter alert financed by Flaherty was released announcing that CitySide was "Positioning Itself as The next must have acquisition for

17

industry giant, Ticketmaster!...With its experienced management team, state-of-the-art e-commerce website…CitySide is poised to become one of the top ticket brokerages in the country."  Virtually none of these representations were true.

49.     At the time of the fraudulent promotional campaign – the pump - neither Flaherty nor Brazil believed that CitySide's business had any real chance of succeeding.  Weed also knew, or was reckless in not knowing, that the business for which he served as Secretary and one of two directors had no realistic chance of success.  At a meeting on March 16, 2010, which was secretly recorded by federal law enforcement agents as part of an undercover investigation, Brazil joked about his and Flaherty's intention to abandon CitySide.

50.     All of the promotions funded by Brazil and Flaherty were false and misleading in that they painted a rosy, optimistic picture of a company that Brazil and Flaherty both believed would fail and which, in fact, did fail.  In addition, Weed knew, or was reckless in not knowing, that CitySide was floundering financially.  In fact, Weed used his position as a company officer and director to prevent the CEO of CitySide from raising much-needed funds by selling restricted stock and convertible notes to outside parties.

51.     Meanwhile, Brazil and Flaherty were planning their sale of CitySide stock at the artificially high prices that the fraudulent promotional campaign had created.  For his part, Weed received thousands of dollars for his role in the scheme.

## 5.  The Dump

52.     Brazil's and Flaherty's efforts to artificially inflate the stock price of CitySide by paying for false and misleading promotional campaigns were successful.  During the period from approximately February 16, 2010 through April 30, 2010, CitySide's stock rose from a closing price of $.25 per share to a high of $.44 per share.  Average daily trading volume during March

and April 2010 was approximately 1,945,864 shares per day, which was 23 times higher than CitySide's average daily trading volume of approximately 82,888 shares per day from December 2009 through February 2010.

53.     Flaherty and Brazil dumped CitySide's stock onto investors from late February 2010 through April 2010 at or about the same time that they artificially increased CitySide's stock price by paying for a false and misleading promotional campaign. Flaherty and Brazil realized approximately three million dollars in illicit proceeds due to their sales of CitySide's stock. Accounts in Flaherty's name sold approximately six million shares of CitySide's stock between February 2010 and April 2010 for proceeds of approximately $1 million. Accounts in the name of Boston Financial Partners and Patrick Brazil also sold approximately six million shares of CitySide's stock during the period February 2010 through March 2010 for proceeds of approximately $1.1 million. Brazil is the president of Boston Financial Partners and Patrick Brazil is his son.

54.     In addition, Brazil and Flaherty caused profits to be realized via trades placed through accounts in the name of other third parties. Specifically, Brazil and Flaherty caused two offshore entities located in Turks and Caicos to sell approximately five million shares of CitySide's stock during the period February 2010 through March 2010 for proceeds of approximately $1.1 million.

55.     Weed profited from his role in the scheme in several ways, including a $5000 per month payment as the purported outside counsel for CitySide and a predecessor entity, and by receiving thousands of dollars spread over multiple payments specifically relating to the pump and dump scheme.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

(Against All Defendants)

56.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 55 above as if set forth fully herein.

57.     From at least the fall of 2008 through the summer of 2010, the defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

58.     By reason of the foregoing, defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1) and (3) of the Securities Act

(Against All Defendants)

59.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

60.     From at least the fall of 2008 through the summer of 2010, the defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication

20

in interstate commerce or by the use of the mails, in the offer or sale of securities a) employed

devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of

business which operated and which would operate as a fraud or deceit upon certain persons.

61.     By engaging in the conduct described above, defendants Richard Weed, Thomas

Brazil and Coleman Flaherty III singly or in concert, directly or indirectly, have violated, and

unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act , 15 U.S.C.

§ 77q(a)(1) and (3).

### THIRD CLAIM FOR RELIEF

**Violation of Section 5(a) and Section 5(c) of the Securities Act**

(Against all Defendants)

62.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 55 above as if set forth fully herein.

63.     From at least the fall of 2008 through the summer of 2010, the defendants Weed,

Brazil and Flaherty directly or indirectly, as to CitySide securities: (a) made use of the means or

instruments of transportation or communication in interstate commerce or of the mails to sell

securities through the use or medium of a prospectus or otherwise; or carried securities or caused

such securities to be carried through the mails or in interstate commerce, by means or

instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of

the means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell or to offer to buy, through the use or medium of any prospectus or

otherwise, securities without a registration statement having been filed with the Commission or

being in effect as to such securities.

64.     Neither CitySide nor its securities were registered with the Commission at the

time of the pump and dump scheme, nor was any registration of CitySide stock in effect at that time.

65.    By reason of the foregoing, Weed, Brazil and Flaherty, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## FOURTH CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)

(Against Defendant Weed)

66.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 55 above as if set forth fully herein.

67.    On or about December 22, 2009, Weed sent a letter to CitySide's transfer agent stating that Trinity Alliance had elected to convert a $20,000 face amount Convertible Note into 5,000,000 shares of common stock.  Weed stated that the Convertible Note was originally issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons who have elected to convert Convertible Notes into common stock were affiliates of the Issuer and that none of these persons had been affiliates during the preceding three months.  Weed knew that the replacement Convertible Note referenced in his December 22, 2009 letter was fraudulent, having been backdated and forged, if it existed at all.  Weed also knew that Trinity Alliance was affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity Alliance.

68.    On or about January 4, 2010, Weed sent a letter to CitySide's transfer agent stating that Trinity International had elected to convert a $20,000 face amount Convertible Note

into 6,218,950 shares of common stock.  Weed stated that the Convertible Note was originally

issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to

the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the

persons who have elected to convert Convertible Notes into common stock are affiliates of the

Issuer and none of these persons have been affiliates during the preceding three months.  Weed

knew that the replacement Convertible Note referenced in his January 4, 2010 letter was

fraudulent, having been backdated and forged.  Weed also knew that Trinity International was

affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity International.

69.     On or about March 15, 2010, Weed sent a letter to CitySide's transfer agent

stating that 24-7 Media had elected to convert a $20,000 face amount Convertible Note into

6,666,667 shares of common stock.  Weed stated that the Convertible Note was originally issued

on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note

Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons

who have elected to convert Convertible Notes into common stock are affiliates of the Issuer and

none of these persons have been affiliates during the preceding three months.  Weed knew that

the replacement Convertible Note referenced in his March 15, 2010 letter was fraudulent, having

been backdated and forged, if it existed at all.  Weed also knew that 24-7 Media was affiliated

with Flaherty.  In fact, Weed knew that Flaherty controlled 24-7 Media.

70.     The letters sent by Weed to CitySide's transfer agent provided clearance for the

transfer agent to issue unrestricted shares of CitySide common stock to Flaherty, Brazil, and

entities under their control, including the letters sent on or about December 22, 2009, January 4,

2010 and March 15, 2010.  The letters sent to CitySide's transfer agent contained material

statements by Weed that were untrue, and failed to include material statements necessary in

order to make the statements made in those letters, in the light of the circumstances under which they were made, not misleading.

71.     By reason of the foregoing, defendant Richard Weed, singly or in concert, directly or indirectly, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## FIFTH CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act

### (Against Defendant Weed)

72.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 55 above as if set forth fully herein.

73.     On or about December 22, 2009 Weed sent a letter to CitySide's transfer agent stating that Trinity Alliance had elected to convert a $20,000 face amount Convertible Note into 5,000,000 shares of common stock.  Weed stated that the Convertible Note was originally issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons who have elected to convert Convertible Notes into common stock were affiliates of the Issuer and that none of these persons had been affiliates during the preceding three months.  Weed knew that the replacement Convertible Note referenced in his December 22, 2009 letter was fraudulent, having been backdated and forged, if it existed at all.  Weed also knew that Trinity Alliance was affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity Alliance.

74.     On or about January 4, 2010, Weed sent a letter to CitySide's transfer agent stating that Trinity International had elected to convert a $20,000 face amount Convertible Note

into 6,218,950 shares of common stock.  Weed stated that the Convertible Note was originally

issued on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to

the Note Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the

persons who have elected to convert Convertible Notes into common stock are affiliates of the

Issuer and none of these persons have been affiliates during the preceding three months.  Weed

knew that the replacement Convertible Note referenced in his January 4, 2010 letter was

fraudulent, having been backdated and forged.  Weed also knew that Trinity International was

affiliated with Flaherty.  In fact, Weed knew that Flaherty controlled Trinity International.

75.     On or about March 15, 2010, Weed sent a letter to CitySide's transfer agent

stating that 24-7 Media had elected to convert a $20,000 face amount Convertible Note into

6,666,667 shares of common stock.  Weed stated that the Convertible Note was originally issued

on June 21, 2008.  He then stated that a replacement Convertible Note was delivered to the Note

Holder by the Issuer on April 4, 2009.  Finally, Weed stated in the letter that none of the persons

who have elected to convert Convertible Notes into common stock are affiliates of the Issuer and

none of these persons have been affiliates during the preceding three months.  Weed knew that

the replacement Convertible Note referenced in his March 15, 2010 letter was fraudulent, having

been backdated and forged, if it existed at all.  Weed also knew that 24-7 Media was affiliated

with Flaherty.  In fact, Weed knew that Flaherty controlled 24-7 Media.

76.     The letters sent by Weed to CitySide's transfer agent provided clearance for the

transfer agent to issue unrestricted shares of CitySide common stock to Flaherty, Brazil, and

entities under their control, including the letters sent on or about December 22, 2009, January 4,

2010 and March 15, 2010.  The letters sent to CitySide's transfer agent contained material

statements by Weed that were untrue, and failed to include material statements necessary in

order to make the statements made in those letters, in the light of the circumstances under which they were made, not misleading.

77.     By engaging in the conduct described above, defendant Richard Weed, singly or in concert, directly or indirectly, has violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act , 15 U.S.C. § 77q(a)(2).

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act

(Against Defendant Weed)

78.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 58 above as if set forth fully herein.

79.     From at least the fall 2008 through the summer of 2010, the defendants Brazil and Flaherty, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully and recklessly a) employed devices, schemes and artifices to defraud, and b) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

80.     Brazil and Flaherty thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c) by engaging in a scheme 1) to manipulate, and thereby artificially increase, the stock price and trading volume of CitySide stock through a fraudulent promotional campaign – the pump -  and to then sell millions of unrestricted shares of the publicly traded stock of CitySide – the dump, and 2) to deceive CitySide's transfer agent and cause the issuance of millions of shares of unrestricted stock which could be, and were, sold to unsuspecting investors in the market.

81.     Weed aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder by Brazil and Flaherty, by knowingly creating backdated and forged convertible promissory notes.  The convertible promissory notes were financial instruments that purportedly reflected agreements by CitySide or its predecessor entity to issue a specified volume of stock in return for loans it received.   Weed then knowingly drafted and sent fraudulent legal opinion letters to CitySide's transfer agent which stated that the promissory notes could be converted into millions of purportedly unrestricted shares of CitySide common stock.

82.     Weed also aided and abetted the violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder by Brazil and Flaherty, by helping to implement a reverse stock split and thereby reduce the number of shares in the hands of public investors and outside of Flaherty's and Brazil's control.  Weed also aided and abetted Brazil and Flaherty by using his position as an officer and director of CitySide to cause the company's issuance of a board resolution requiring CitySide's CEO to refer to Weed all calls and inquiries from investors, current and former shareholders, and others.

83.     By reason of the foregoing, defendant Richard Weed aided and abetted Brazil's and Flaherty's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment that:

## **I.**

Permanently enjoins defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, their agents, servants, employees, attorneys, and all persons in active concert or participation

with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.

Permanently enjoins defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## III.

Permanently enjoins defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## IV.

Orders defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## V.

Orders and requires defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest.

**VI.**

Issues an Order barring defendants Richard Weed, Thomas Brazil and Coleman Flaherty III, from participating in any offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

**VII.**

Issues an Order barring Weed from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d),

**VIII.**

Retains jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

**IX.**

Grants such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Dated:   Boston, Massachusetts
         November 6, 2014

On behalf of the Commission,


_____//s// Martin F. Healey_____
Martin F. Healey (MA BBO No. 227550)
Andrew Palid (MA BBO No. 664968)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
(617) 573-8952 (Healey)
HealeyM@sec.gov